**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

WILLIAM R. DONOVAN,

    Defendant - Appellant.

No. 19-6167
(D.C. No. 5:13-CR-00289-HE-1)
(W.D. Oklahoma)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **EBEL**, and **EID**, Circuit Judges.
_____

## I. INTRODUCTION

William R. Donovan stipulated to four violations of the conditions of his

supervised release from a conviction for conspiracy to commit bank fraud. The

district court revoked his release and sentenced him to 18 months' imprisonment,

above the 6–12 month range recommended by the advisory policy statements found

in Chapter 7 of the Sentencing Guidelines, but below the 24-month statutory

maximum. Mr. Donovan appeals this sentence on grounds of procedural and

substantive unreasonableness. Both challenges stem from his argument that the court

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

impermissibly premised its sentencing decision on unproven, uncharged factual allegations that Mr. Donovan was involved in several tag agency burglaries under investigation by a local Oklahoma police department.

Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm the district court's sentence as both reasoned and reasonable. There was no plain procedural error, because the court's sentencing decision was premised not on the uncharged factual allegations Mr. Donovan complains of, but rather on conduct to which he admitted—primarily, purposefully deceiving his probation officer. There was also no substantive error: The court did not abuse its discretion by imposing a sentence six months longer than the high end of the Guidelines range, because its reasoning closely matched the core Chapter 7 guidance pertaining to revocation sentencing philosophy.

## II.   BACKGROUND

On December 10, 2013, a federal grand jury returned a seven-count indictment against Mr. Donovan and two co-defendants, charging Mr. Donovan with three counts of bank fraud, in violation of 18 U.S.C. § 1344, three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A, and one count of conspiracy to commit those offenses, in violation of 18 U.S.C. § 371. These charges stemmed from allegations that Mr. Donovan engaged in a scheme to make fraudulent personal identification documents, using employee information stolen from a petroleum transportation services company at which he worked, for the purpose of cashing

2

counterfeit checks. The scheme involved burglarizing Oklahoma tag agencies[1] to steal items used to create false IDs, "including printers, cameras, blank driver's license card stock, copies of birth certificates, copies of marriage licenses, [and] driver's license applications." Supp. ROA at 7. Mr. Donovan admitted to federal investigators that he was involved in various Oklahoma tag agency burglaries committed in 2013. He also admitted to making counterfeit driver's licenses to cash counterfeit checks. The scheme resulted in the successful cashing of 36 counterfeit checks, for a total loss of $44,883.

On February 3, 2014, Mr. Donovan entered a plea agreement with the government, pursuant to which he pleaded guilty to the one charged count of conspiracy, in violation of 18 U.S.C. § 371, and the government dismissed the other counts. The district court accepted this plea and, on September 4, 2014, sentenced Mr. Donovan to 60 months in prison followed by three years of supervised release.

Mr. Donovan was released from prison and began serving his three-year term of supervised release on November 1, 2017. On April 2, 2019, Mr. Donovan's

---

[1] Tag agencies are private companies that provide vehicle licensing and registration services. "Although tag agencies are run by private individuals, the services they provide come from, and monies collected go to, the Oklahoma Tax Commission." *Find a Tag Agent*, Oklahoma Tax Commission, http://www.ok.gov/tax/Individuals/Motor_Vehicle/Find_a_Tag_Agent/ (last modified July 23, 2018). Tag agencies have a monopoly on driver's license services in Oklahoma, which is "the only state that handles driver's licenses exclusively through privately owned, state-subsidized businesses." Jeff Raymond, *As State Government Goes More Digital, Tag Agencies Endure*, Oklahoma Watch (May 6, 2019), http://oklahomawatch.org/2019/05/06/even-with-digital-drivers-licenses-tag-agencies-likely-to-remain/.

probation officer notified the federal district court for the Western District of Oklahoma that Mr. Donovan had submitted nine methamphetamine-positive urine samples between November 7, 2018, and March 5, 2019, and had failed to submit a urine sample as directed four times in the first three months of 2019. As a result, Mr. Donovan was referred to the Court-Assisted Recovery Effort program ("CARE"). After some initial success with that program, Mr. Donovan again submitted methamphetamine-positive urine samples in August and September of 2019.

On October 3, 2019, Detective William Carpenter of the Mustang, Oklahoma police department ("Mustang PD") contacted Mr. Donovan's probation officer. Detective Carpenter informed the probation officer that Mr. Donovan was a primary suspect in three Oklahoma tag agency burglaries under investigation by the Mustang PD—one in May 2019 and two in September 2019. Detective Carpenter told the probation officer that Mr. Donovan's vehicle was identified on surveillance video and in photos from the two September burglaries. From the video, Detective Carpenter estimated that the primary suspect was around 6'5" tall, which he averred also pointed to Mr. Donovan, who is 6'7".

Based on the drug testing violations and the information from Detective Carpenter, the probation office conducted a search of Mr. Donovan's residence on October 10, 2019. The search revealed that Mr. Donovan was using a computer program to illegally download software. The government's search of his person revealed a USB drive containing the personal information of individuals that Mr. Donovan did not have permission to possess. The government also found illegal

4

drugs in Mr. Donovan's residence and items indicating drug use. When questioned about the recent tag agency burglaries by Detective Carpenter, who participated in the search, Mr. Donovan denied any involvement.

The October search also turned up a check, dated August 21, 2019, and made out to Mr. Donovan from Vantage Point ITAD, a company whose services include "safely extracting data from computers which could contain sensitive information."[2] ROA Vol. 2 at 3. Mr. Donovan admitted that he had been working "on the side" for Vantage Point. *Id.* Mr. Donovan interviewed with Vantage Point in July 2019, and his probation officer advised him around that time that she would need to conduct "a very detailed conversation" with Vantage Point prior to his accepting employment with the company, given that his past conduct "included accessing a network to steal people's personal information." *Id.* Mr. Donovan had at that point agreed to remain at his job at a pallet shipping company and to refrain from pursuing employment at Vantage Point until he proceeded further in the CARE program.

Following the search, Mr. Donovan's probation officer instructed him to continue complying with the mandated drug testing and counseling conditions of his supervised release. Four days later, on October 14, 2019, Mr. Donovan failed to report to a required drug counseling session.

---

[2] At oral argument, the government described Vantage Point as "an information technology asset disposition firm," which resells businesses' used computer hardware after wiping it of any sensitive information. Oral Arg. at 17:10-17:35.

On October 16, 2019, the probation office issued a warrant recommending that Mr. Donovan's term of supervised release be revoked, which the district court approved. Mr. Donovan was taken into custody that same day. The warrant alleged five violations of the conditions of Mr. Donovan's supervised release: that he (1) committed a crime by downloading copyrighted computer software; (2) committed a crime by possessing the identification of another person without lawful authority; (3) unlawfully possessed and used a controlled substance; (4) lied to his probation officer about accepting employment at Vantage Point ITAD; and (5) failed to report for a substance abuse counseling program as directed.

On October 25, 2019, the probation office issued a violation report explaining its allegations and its recommendation to revoke Mr. Donovan's supervised release in favor of prison time. In a section of the report titled "Adjustment to Supervision," the probation office laid out the factual basis for revoking Mr. Donovan's supervised release. ROA Vol. 2 at 2–4. Mr. Donovan failed to dispute any of these facts, including those reported to federal authorities by Detective Carpenter that linked Mr. Donovan to the recent tag agency burglaries. The report also noted that the drug offenses alleged in violation #3—possession of a controlled substance and more than three positive drug tests over the course of a year—subjected Mr. Donovan to statutorily mandated revocation and imprisonment. *See* ROA Vol. 2 at 1 (citing 18 U.S.C. §§ 3583(g)(1) and (g)(4)). The conspiracy conviction that resulted in Mr. Donovan's term of supervised release led to a statutory maximum revocation sentence of 24 months. *See* 18 U.S.C. § 3583(e)(3). Based on the grade of

6

Mr. Donovan's alleged supervised release violations and his criminal history category (IV), the probation office calculated an advisory range under the federal Sentencing Guidelines of 12–18 months. *See* U.S.S.G. § 7B1.4(a) (term of imprisonment table for revocation sentences). The probation office, however, recommended the statutory maximum, 24 months, followed by 12 months of supervised release.

Mr. Donovan's revocation hearing took place on October 28, 2019. At the outset, the government withdrew alleged violation #2, because possessing the identification of another person without lawful authority is not a crime under federal or Oklahoma law. Mr. Donovan stipulated to the remaining four violations of the terms of his supervised release: illegally downloading copyrighted software (violation #1); using a controlled substance (#3); lying to his probation officer (#4); and failing to report for drug counseling (#5). Regarding violation #1, however, the government informed the court that the monetary value of the copyright infringement at issue led to a lesser offense than calculated by the probation office—a Grade C violation of the federal criminal code, rather than Grade B. This reduced the recommended range of imprisonment under Chapter 7's advisory policy statements from 12–18 months to 6–12 months. *See* U.S.S.G. § 7B1.4(a). The government, the probation office, and Mr. Donovan all concurred in this reduction of the applicable policy range, to which the district court responded, "All right." ROA Vol. 3 at 7.

Because Mr. Donovan's stipulation to four violations of the terms of his supervised release established a clear basis for revocation, the district court heard

from both parties "as to what we ought to do in the circumstances." *Id.* at 6.

Mr. Donovan requested his sentencing be continued to allow him to first complete inpatient drug treatment. The government, after contending that drug treatment had "not worked" for Mr. Donovan, addressed what it deemed "the elephant in the room": what he was doing while on supervised release. *Id.* at 13. Based on the results of the October search and the tag agency burglary allegations laid out in the violation report, the government argued that Mr. Donovan was not "merely out here using methamphetamine," but that his conduct was "a lot . . . worse than that." *Id.* at 14–15. The government highlighted the alleged facts that Mr. Donovan's car was picked up on video surveillance at the burglarized tag agencies and that "the person who was actually committing the burglary is described as someone very large, I believe someone six-four to six-six." *Id.* at 14. The government then asked the judge to impose the maximum sentence of 24 months, in line with the probation office's recommendation.

After hearing from both parties, the district court first confirmed with the government that the Mustang PD's investigation into the recent tag agency burglaries had not progressed beyond the preliminary stage. The court then stated that it might be inclined to take Mr. Donovan's suggested sentencing approach "if we were here simply dealing with a matter of violations of the supervised release terms relating to controlled substances." *Id.* at 16. The court found, however, "that the circumstances here are considerably more serious than that, in terms of the conduct of the defendant." *Id.*

8

Next, the district court discussed the tag agency burglary allegations contained in the violation report:

> There's at least some indication that this investigation going on relating to new burglaries of tag agencies, it sounds as though from the references to tag numbers and that sort of thing that there may be some substance to that.
>
> Obviously, for present purposes, I'm not going to assume that the defendant committed that further offense. That's not what I'm sentencing for here today, even if I did conclude that. But I think it's premature for me to assume that the defendant has, you know, gone back to the same course of conduct again.
>
> The evidence here I think is sufficient to persuade me that he might be. I mean, I can't think of any other reason why he would be downloading the kind of stuff he was downloading and the sorts of personal identification information that he apparently had on him and that sort of thing.

*Id.* at 16–17.

The district court added a final disclaimer to its discussion of the recent tag agency burglaries before addressing the violations to which Mr. Donovan stipulated:

> [A]s I say, I don't think it's appropriate for me to proceed on the assumption he's been out bumping off tag agencies. But I do think that what strikes me as the most serious aspect of the circumstances here, separate and apart from the drug use, has to do with the violation that, essentially, said he was lying to the probation officer. It was a very important thing he was lying about.
>
> At the time he went on supervised release, as I said, it was against the backdrop of this history of fraudulent activity of accessing information from employers or others and . . . the violation report indicates that the probation officer said, look, if you're going to go to work for this Vantage Point outfit, we've got to make darn sure they know what your background is because of the potential there for him to be in a position with a company like Vantage Point where he could access the same sorts of information.

9

And if we're going to put him in a position where there's that kind of a risk, then, as the violation report indicates, it makes an abundant amount of sense to make sure that that prospective employer knows the history and knows explicitly the risk they're assuming by hiring the defendant.

The defendant says, according to the report here, that he's going to do that sometime later . . . , when, in fact, he went ahead and essentially misrepresented that to the probation officer and went ahead to go to work for Vantage Point working on the side for them. . . .

[T]hat's the sort of a breach of confidence, a breach of the necessary conduct for the supervision relationship to work properly . . . that, in my view, is a very serious violation here that I think requires a meaningful response. . . .

[T]he breach of a duty of truthfulness and candor to the probation officer is a serious enough matter that there needs to be a meaningful sentence imposed here, and so that's what I'm going to do.

*Id.* at 17–18.

The district court then sentenced Mr. Donovan to 18 months of imprisonment followed by 12 months of supervised release. When Mr. Donovan's defense counsel was asked by the court whether, "beyond the matters [he'd] previously noted," there was "any reason why the sentences imposed by the Court would be improper," he answered in the negative. This appeal followed.

## III.   DISCUSSION

"When a convicted defendant violates a condition of supervised release, the sentencing judge may revoke the term of supervised release and impose prison time." *United States v. Vigil*, 696 F.3d 997, 1002 (10th Cir. 2012). "In imposing a sentence for a violation of supervised release, a district court is required to consider the policy statements contained in Chapter 7 of the Sentencing Guidelines and a number of

10

factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Ortiz-Lazaro*, 884 F.3d 1259, 1262 (10th Cir. 2018); *see* 18 U.S.C. § 3583(e)(3) ("The court may, after considering the factors set forth in" certain subsections of § 3553(a), "revoke a term of supervised release" and impose a prison sentence.). "All discussions of applicable sentences before a district court following the revocation of supervised release should be grounded in the common understanding that the district court may impose any sentence within the statutory maximum." *Vigil*, 696 F.3d at 1002 (quotation marks omitted).

"We review all sentences, including those imposed for violations of supervised release, for reasonableness." *United States v. Rausch*, 638 F.3d 1296, 1302 (10th Cir. 2011), *overruled on other grounds by United States v. Bustamante-Conchas*, 850 F.3d 1130 (10th Cir. 2017) (en banc). "When we review for reasonableness, our review includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence." *Ortiz-Lazaro*, 884 F.3d at 1261 (internal quotation marks omitted). "[I]mposition of a sentence in excess of that recommended by the Chapter 7 policy statements of the Sentencing Guidelines will be upheld if it can be determined from the record to have been reasoned and reasonable." *United States v. Tedford*, 405 F.3d 1159, 1161 (10th Cir. 2005) (internal quotation marks omitted). "[A] 'reasoned' sentence is one that is 'procedurally reasonable'; and a 'reasonable' sentence is one that is 'substantively reasonable.'" *United States v. McBride*, 633

11

F.3d 1229, 1232 (10th Cir. 2011). "To say that the district court acted reasonably—either procedurally or substantively—is to say that it did not abuse its discretion." *Id.*

We address in turn Mr. Donovan's procedural and substantive reasonableness challenges to his 18-month revocation sentence.

### A. *Procedural Reasonableness*

"Review for procedural reasonableness focuses on whether the district court committed any error in calculating or explaining the sentence." *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009). Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007).

Mr. Donovan argues that his 18-month revocation sentence is procedurally unreasonable because it was premised on unproven facts contained in the probation report—namely, uncharged allegations regarding the 2019 tag agency burglaries under investigation by the Mustang PD. The first hurdle Mr. Donovan faces in advancing this argument is his failure to object to the district court's purported consideration of such unproven, uncharged allegations at the hearing. Specifically, after the court announced its sentencing decision, Mr. Donovan declined the opportunity to place in the record any reason why the sentence imposed was improper. Thus,

12

> [i]n this case a sufficient opportunity [to object] was made available. If [Mr. Donovan] had objections to the sentence imposed or, more particularly, to the decision-making process, he could and should have raised them at a time and in such a way as to afford the trial judge an opportunity to correct any error, clarify any ambiguity or elaborate as necessary.

*See United States v. Steele*, 603 F.3d 803, 807 (10th Cir. 2010). Accordingly, we review his procedural objection only for plain error. *See United States v. Ruby*, 706 F.3d 1221, 1225–26 (10th Cir. 2013); *see also McBride*, 633 F.3d at 1233 (reviewing for plain error when the defendant did not contemporaneously object to the district court's consideration of "allegations that had neither been stipulated to, nor proven by the presentation of evidence" at the revocation hearing).[3]

---

[3] Mr. Donovan argues that no contemporaneous objection was needed to preserve the issue for appellate review because "[t]here is no doubt that the district court was *aware* of the impropriety of relying on the unproven allegations," and therefore objecting "on this basis could hardly have served any purpose." Appellant Br. at 13.

In *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003), we held that

> when the district court *sua sponte* raises and explicitly resolves an issue of law on the merits, the appellant may challenge that ruling on appeal on the ground addressed by the district court even if he failed to raise the issue in district court. In such a case, review on appeal is not for "plain error," but is subject to the same standard of appellate review that would be applicable if the appellant had properly raised the issue.

This rule is based on the principle that "appellate courts can reach issues that were either 'pressed' by the appellant before, or 'passed upon' by, the lower court." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 992 (10th Cir. 2019) (quotation marks omitted). "An appellate court is therefore 'permit[ed] review of an issue not pressed so long as it has been passed upon.'" *Id.* (quoting *United States v. Williams*, 504 U.S. 36, 41 (1992)). "A court 'passes upon' an issue when it applies the relevant law to the relevant facts." *Id.* (internal quotation marks omitted).

13

"Under plain error review, the defendant must demonstrate (1) there is error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Ruby*, 706 F.3d at 1226. The first element is comprised of two sequential steps—determining whether the district court committed the claimed error, and if it did, then determining the subsidiary legal question of whether the court's action (or omission) actually constituted error. Here, Mr. Donovan's challenge fails at the threshold step, because, contrary to his assertion, the court did not base its sentence upon unproven, uncharged factual allegations.

To be sure, in addressing what the government called "the elephant in the room," ROA Vol. 3 at 13—the uncharged tag agency burglary allegations discussed in Mr. Donovan's violation report—the district court did note "that there may be some substance" to those allegations. *Id.* at 16. And the court did go on to state that the evidence was "sufficient to persuade me that [Mr. Donovan] might" have committed the recent burglaries, because it could not "think of any other reason why

---

We reject Mr. Donovan's argument that the plain error standard does not apply, because the record shows that the district court did not fully pass upon the issue of whether a sentencing decision can be based partly on unproven, uncharged allegations in a violation report. But even if we determined that the district court did directly decide this issue, such a conclusion would be of little help to Mr. Donovan. That is because the court deemed it inappropriate to base its sentencing decision on the uncharged allegations, and nothing in the record clearly indicates it ignored its own conclusion on that front. *Cf. United States v. Hernandez-Martinez*, 485 F.3d 270, 274 (5th Cir. 2007) ("Ultimately, any difference between the two proffered standards of review for a revocation sentence would not affect [the defendant's] fate.").

he would be downloading the kind of stuff he was downloading and the sorts of personal identification information that he apparently had on him." *Id.* at 16–17. Standing alone, these statements might well lead us to conclude that the imposition of Mr. Donovan's 18-month revocation sentence was based at least in part on these factual allegations. *Cf. United States v. Barbieri*, 49 F. App'x 824, 826–27 (10th Cir. 2002) (unpublished) (discussing several "improper" and "questionable" statements made by a district court "regarding its belief that the defendant might have violated more terms of his supervised release than his probation officer was aware of").

These statements, however, did not stand alone, but were accompanied by several disclaimers. "Obviously," the district court stated, it was "not going to assume that the defendant committed that further offense," because "even if [it] did conclude" that Mr. Donovan perpetrated any of the uncharged burglaries, "[t]hat's not what I'm sentencing for here today." ROA Vol. 3 at 16. The court also found that it would be "premature" to assume Mr. Donovan had "gone back to the same course of conduct," *id.*—that is, premature to assume he had returned to burglarizing tag agencies while on supervised release from a fraud conspiracy conviction that was grounded in that same pattern of criminal activity. The court then reiterated this conclusion, stating that "I don't think it's appropriate for me to proceed on the assumption he's been out bumping off tag agencies." *Id.* at 17.

After disclaiming any reliance on the tag agency burglary allegations, the district court then transparently laid out the conduct upon which it *did* base its sentencing decision, stating that "the most serious aspect of the circumstances here,

15

separate and apart from the drug use, has to do with the violation that, essentially, said he was lying to the probation officer."[4] *Id.* This referred to warrant violation #4—that Mr. Donovan was dishonest about his Vantage Point employment—which was among the violations to which Mr. Donovan stipulated. The court found that this "was a very important thing he was lying about," due to "the potential . . . for [Mr. Donovan] to be in a position with a company like Vantage Point where he could access the same sorts of [personal] information" that he misappropriated in furtherance of the bank fraud conspiracy that led to his underlying conviction. *Id.* "[I]f we're going to put [Mr. Donovan] in a position where there's that kind of a risk" regarding his illegal conversion of personal identifying information, the court went on to state, "it makes an abundant amount of sense to make sure that that prospective employer knows the history and knows explicitly the risk they're assuming by hiring the defendant." *Id.* But before his probation officer could have a "very detailed conversation with the employer" to clearly convey that risk, ROA Vol. 2 at 3, Mr. Donovan began to work for Vantage Point "on the side," and "misrepresented that to the probation officer," ROA Vol. 3 at 18.

The district court left little doubt that it was imposing a sentence based on this breach of trust, rather than on any factual allegations related to the uncharged tag agency burglaries. Mr. Donovan's intentional concealment of his Vantage Point

---

[4] This statement—particularly, the phrase "separate and apart from the drug use"—suggests that the district court based its sentencing decision only upon Mr. Donovan's drug use (stipulated violation #3) and untruthfulness (stipulated violation #4).

16

employment from his probation officer was "the sort of a breach of confidence, a breach of the necessary conduct for the supervision relationship to work properly," the court determined, that "is a very serious violation . . . requir[ing] a meaningful response." *Id.* The court went on to conclude that this "breach of a duty of truthfulness and candor to the probation officer is a serious enough matter that there needs to be a meaningful sentence imposed here." *Id.* That meaningful sentence, in the court's determination, was 18 months' imprisonment—above the Chapter 7 advisory policy statement range of 6–12 months, *see* U.S.S.G. § 7B1.4(a), but below the government's request for the 24-month statutory maximum, *see* 18 U.S.C. § 3583(e)(3).

It is thus clear from the record that, despite the district court's references to the recent tag agency burglaries, it did not base Mr. Donovan's revocation sentence on these factual allegations, even in part. Both the court's explicit disclaimers that it would be premature and inappropriate to place any decisional weight on the tag agency burglary allegations, as well as its significant and repeated emphasis on Mr. Donovan's admitted violation of his "duty of truthfulness and candor," ROA Vol. 3 at 18, lead to the conclusion that the government's presentation of the tag agency burglary evidence did not "help[] sway [the] sentencing decision," contrary to Mr. Donovan's assertion. *See* Appellant Br. at 11. As such, the court did not act in the way Mr. Donovan claims constitutes procedural error.

Because we determine that the district court did not procedurally err under the first element of plain-error review, we need not analyze the remaining elements. *See*

17

*United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012) ("Because all four [plain error] requirements must be met, the failure of any one will foreclose relief and the others need not be addressed.").[5]

### B. *Substantive Reasonableness*

"Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Friedman*, 554 F.3d at 1307. In the context of revocation sentencing based on a violation of supervised release, those factors include:

> the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; pertinent guidelines; pertinent policy statements; the need to avoid unwanted sentence disparities; and the need to provide restitution.

*United States v. Contreras-Martinez*, 409 F.3d 1236, 1242 n.3 (10th Cir. 2005); *see* 18 U.S.C. § 3583(e) (calling for consideration of these § 3553(a) factors prior to

---

[5] Additionally, because we determine that the district court did not rely on the uncharged burglaries in imposing its sentence, we pass no judgment on the subsidiary legal question of whether such reliance would actually amount to procedural error. We note, however, that Mr. Donovan did not dispute any of the factual findings presented in the presentence investigation report. "At sentencing, the court may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). Furthermore, "at a sentencing hearing the court can have access to any relevant information, as long as it adheres to a preponderance of the evidence standard." *United States v. Ruby*, 706 F.3d 1221, 1227 (10th Cir. 2013). And an undisputed statement can satisfy the preponderance of the evidence standard in the absence of contrary evidence. *See United States v. Tindall*, 519 F.3d 1057, 1064 (10th Cir. 2008).

revocation of a term of supervised release and imposition of a sentence). The district court "is not required to consider individually each factor listed in § 3553(a), nor is it required to recite any magic words to show us that it fulfilled its responsibility to be mindful of the[m]." *Steele*, 603 F.3d at 808. Rather, "it is enough if the district court considers § 3553(a) en masse and states its reasons for imposing a given sentence." *United States v. Kelley*, 359 F.3d 1302, 1305 (10th Cir. 2004); *see* 18 U.S.C. § 3553(c).

We review the substantive reasonableness of a sentence for abuse of discretion. *Gall*, 552 U.S. at 51. "This standard applies without regard to whether the district court imposes a sentence within or outside the advisory Guidelines range."[6] *Steele*, 603 F.3d at 809. While a revocation sentence within the Chapter 7 advisory policy range is presumptively reasonable, *see McBride*, 633 F.3d at 1232–33, a sentence outside that range is not presumptively unreasonable, *see Gall*, 552 U.S. at 51. The appellate court

> may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

*Id.*

---

[6] While Mr. Donovan did not object below to the length of his sentence, "when the claim is merely that the sentence is unreasonably long, we do not require the defendant to object in order to preserve the issue." *United States v. Torres-Duenas*, 461 F.3d 1178, 1183 (10th Cir. 2006).

Mr. Donovan asserts that the district court's upward variance from the Chapter 7 policy statement range was largely based on the unproven tag agency burglary allegations, and was therefore substantively unreasonable. He argues that the court should have instead "sentenced him based solely on the conduct admitted"—"namely that he had used drugs, failed to appear for treatment, downloaded copyrighted software and was working at undisclosed employment." *Id.* But as discussed in relation to procedural reasonableness, the record reveals that the court *did* sentence Mr. Donovan based solely on the conduct admitted. Specifically, it based the sentence in large part on Mr. Donovan's admitted untruthfulness to his probation officer regarding his unauthorized employment at Vantage Point.

Placing such heavy emphasis on this "breach of a duty of truthfulness and candor to the probation officer," ROA Vol. 3 at 18, is in accord with Chapter 7's policy statements, which are among the § 3553(a) factors required to be considered when imposing a revocation sentence. *See* 18 U.S.C. § 3583(e). The United States Sentencing Commission

> debated two different approaches to sanctioning violations of probation and supervised release. The first option considered a violation resulting from a defendant's failure to follow the court-imposed conditions of probation or supervised release as a "breach of trust." . . . The second option . . . sought to sanction violators for the particular conduct triggering the revocation as if that conduct were being sentenced as new federal criminal conduct. . . . [T]he Commission adopted an approach that is consistent with the theory of the first option; i.e., at revocation the court should sanction primarily the defendant's breach of trust . . . .

U.S.S.G. Ch. 7, Pt. A, 3(b); *see Contreras-Martinez*, 409 F.3d at 1241 ("The violation of a condition of supervised release is a breach of trust and, while the

20

sentencing court at revocation takes into account the seriousness of the underlying crime, it is primarily the breach of trust that is sanctioned.").

Here, the district court hewed closely to this guidance in imposing Mr. Donovan's revocation sentence, by primarily sanctioning Mr. Donovan for lying to his probation officer about his employment, "the sort of a breach of confidence, a breach of the necessary conduct for the supervision relationship to work properly, . . . [that] requires a meaningful response." ROA Vol. 3 at 18. While the Sentencing Commission's favored approach treats *any* violation of the conditions of supervised release as a breach of trust, it is reasonable to treat a violation that itself amounts to untruthfulness in dealing with a probation officer as "a very serious" breach of trust, as the district court did here. *Id.* Thus, although the court did not specifically reference Chapter 7's policy statements, it is evident that it considered them. *See United States v. Lee*, 957 F.2d 770, 775 (10th Cir. 1992) ("[A]lthough the court did not specifically reference" the revocation sentencing table, "it is evident that the court considered the provisions of U.S.S.G. Ch. 7.").

This court has recognized the reasonableness of a similar approach to revocation sentencing. In *United States v. Vigil*, the defendant received a revocation sentence of 12 months, above the 3- to 9-month range recommended by the Chapter 7 policy statements. 696 F.3d at 1001. The defendant admitted a "propensity to misstate the truth" during her term of supervised release, and the district court, in deciding to impose a sentence above the recommended range, emphasized that she "lie[d] on every single event that's in this violation report." *Id.* at 1001–02. We consequently

21

rejected the defendant's argument that her sentence was substantively unreasonable, while highlighting Chapter 7's directive that the court should primarily sanction the defendant's breach of trust. *Id.* at 1003. *See also Steele*, 603 F.3d at 806, 809 (rejecting a substantive reasonableness challenge to an 18-month revocation sentence, where the Chapter 7 policy range was 4–10 months, based on the defendant's breach of trust); *Lee*, 957 F.2d at 771, 775 (rejecting a substantive reasonableness challenge to a 24-month revocation sentence, where the Chapter 7 policy range was 3–9 months, while noting that the district court "recited the nature and circumstances of the offense by which defendant breached the trust of the court").

Furthermore, "a court does not need to find severe or exceptional circumstances to impose a sentence above the range suggested in the Chapter 7 policy statements, which are not mandatory and even less compelling than established Guidelines."[7] *Vigil*, 696 F.3d at 1002–03; *see also Contreras-Martinez*, 409 F.3d at 1240 ("[T]he Chapter 7 provisions dealing with violations of supervised release . . . merely constitute 'advisory' policy statements."). The district court thus did not abuse its discretion by imposing a revocation sentence six months above the top of the Chapter 7 advisory range, but six months below the statutory maximum, based

---

[7] The United States Sentencing Commission "faced a choice between promulgating guidelines or issuing advisory policy statements for the revocation of probation and supervised release." U.S.S.G. Ch. 7, Pt. A, 3(a). The Commission opted "to promulgate policy statements only," *id.* at 1, which "provide[] greater flexibility to both the Commission and the courts," *id.* at 3(a). *See also United States v. Redcap*, 505 F.3d 1321, 1323 (10th Cir. 2007).

primarily on a violation of supervised release that it reasonably characterized as a serious breach of trust.

In sum, the district court's imposition of an 18-month sentence was neither substantively unreasonable nor plainly procedurally unreasonable.

## IV.  CONCLUSION

For these reasons, we **AFFIRM** the 18-month revocation sentence imposed by the district court on Mr. Donovan.

ENTERED FOR THE COURT


Carolyn B. McHugh
Circuit Judge